**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN MYERS, | : | CASE NO. 4:19-CV-476 |
| | : | |
| Petitioner, | : | JUDGE CHRISTOPHER A. BOYKO |
| | : | MAG. JUDGE JAMES R. KNEPP II |
| vs. | : | |
| | : | **MEMORANDUM IN SUPPORT OF** |
| UNITED STATES OF AMERICA, | : | **MOTION FOR GOOD-TIME CREDITS** |
| | : | **UNDER 28 U.S.C. § 2241 AND MOTION** |
| Respondent. | : | **FOR INTERIM RELEASE** |

John Myers has moved for an order directing the Bureau of Prisons to award him good-time credits at a rate of 54 days per qualifying year, as required by the First Step Act of 2018. Under federal statutes, prisoners satisfy their sentences through actual time in custody plus good-time credits. *See* 18 U.S.C. §§ 3624(a) & (b). For years, the Bureau of Prisons has interpreted the good-time-credit statute to permit a maximum credit of only 47 days per year, despite the statute indicating 54 days. In the First Step Act, Congress amended section 3624(b) to make clear that it meant what it said the first time: good-time credits count up to 54 days per year, not 47 days. *See* First Step Act, Title I, Sec. 102(b)(1)(A). This amendment applies retroactively. *Id.* Sec. 102(b)(3).

Despite the change in the law, the BOP has told all prisoners that it will not recalculate good-time credits until the Attorney General completes an unrelated "risk and needs assessment system," which impacts a new "earned time credit" system but does not affect good-time credits. As a result, the BOP will not recalculate good-time credits for Mr. Myers and prisoners like him until after they are entitled to release under the amended statute. Mr. Myers therefore requests that the Court order the BOP to recalculate his good-time credits immediately.

Additionally, because Mr. Myers is entitled to immediate release under the correct calculation, he requests that the Court order his interim release pending a final decision.

1

**I.      Background**

On April 9, 2013, the U.S. District Court for the Western District of Louisiana sentenced Mr. Myers to 100 months in prison. Dkt. 25, Case No. 5:12-cr-61 (W.D. La.). The BOP, using its now-superseded 47-days-per-year good-time calculation, has set his release date for June 8, 2019. Under section 3624(b) as amended by the First Step Act, Mr. Myers would have already been released as of April 11, 2019.

On February 11, 2019, Mr. Myers filed a pro se motion under 28 U.S.C. § 2241 seeking an order requiring the BOP to accurately calculate his release date under the First Step Act. Dkt. 1. On April 22, 2019, Chief Judge Gaughan issued a General Order, which appointed the Office of the Federal Public Defender to represent petitioners who have filed petitions seeking good-time credits under the First Step Act. *See* N.D. Ohio, General Order No. 2019-09.

**II.     Law & Analysis**

    **a.   The First Step Act implemented Congress's intent to correct the BOP's good-time-credit calculation, and separately created a new and independent "earned time credit" system.**

Congress originally intended that the BOP grant up to 54 days per year of good-time credits, not the 47 days that the BOP has used. The First Step Act corrected that error. The Sentencing Reform Act of 1984 eliminated the parole system and sharply cut back on the rate at which federal prisoners could earn good-time credit, providing in § 3624(b) that prisoners could receive "credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment." The legislative history of the original bill is rife with references to providing a maximum 15 percent reduction for good-time credits, which would require 54 days of credit per year of the sentence imposed.

2

*See, e.g.*, 131 Cong. Rec. S4083-03 (1985) (statement of Sen. Kennedy) (under the Act, the "sentence announced by the sentencing judge will be for almost all cases the sentence actually served by the defendant, with a 15 percent credit for 'good time.'"); 131 Cong. Rec. E37-02 (1985) (statement of Rep. Hamilton) ("Now sentences will be reduced only 15% for good behavior."); *see also* 141 Cong. Rec. S2348-01, S2349 (1995) (statement of Sen. Biden) (as co-author of section 3624(b), on a sentence of ten years, "you are going to go to prison for at least 85 percent of that time . . . . You can get up to 1.5 years in good time credits[.]").

However, the BOP's mathematical formula for counting the 54 days against time actually served, as opposed to the sentence imposed, resulted in prisoners receiving only 47 days of credit for each year of the term of imprisonment. With the BOP's calculation based on actual time of custody, prisoners have received reductions of only 12.8 percent of the sentence imposed, not the 15 percent Congress contemplated.

In recent years, the Department of Justice and the BOP supported legislation that would clarify that the 54-day calculation was based the sentence imposed, thereby increasing the maximum available good-time credits from 47 to 54 days per year. *See Hearing on the Oversight of the Federal Bureau of Prisons Before the Subcomm. on Crime, Terrorism, Homeland Security and Investigations of the H. Comm. on the Judiciary*, 113th Cong., at 23-24 (2013) (Statement of Charles E. Samuels, Jr. Director, Federal Bureau of Prisons). By doing so, the statute would conform to the intent of the original legislation to grant a maximum 15 percent reduction.

The First Step Act enacted that change. Title I of the First Step Act, entitled "Recidivism Reduction," consists of seven sections spanning 57 pages. The bulk of the title is set out in Section 101 and provides instructions for the Attorney General to create and to implement a "risk

3

and needs assessment system," referred to in the legislation as "the System," along with recidivism reduction programming. *See* First Step Act, Title I, Sec. 101. The legislation instructs that the System must provide incentives for participation in programming, with the central incentive being the possibility of earning "earned time credit" to be "applied toward time in prerelease custody or supervised release." *Id.* Sec. 101(a).

As part of the earned time credit system, Section 102 of the law adds subsection (g) to 18 U.S.C. § 3624. *Id.* Sec. 102(b)(1)(B). Under that provision, the BOP can place an "eligible prisoner" who has earned time credits equal to the time remaining on his or her sentence in prerelease custody (home confinement or residential reentry center) or transfer the prisoner to supervised release up to 12 months early. *Id.* Section 3624(g)(1) starts with a reference to the eligible prisoners to whom "this subsection" applies. *Id.*

Contained within Section 102(b) of the First Step Act is the two-paragraph "good-time fix" amendment to 18 U.S.C. § 3624(b) that applies to this case and that provides in full:

Section 3624 of title 18, United States Code, is amended—

(A) in subsection (b)(1)—

(i) by striking '', beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term,'' and inserting ''of up to 54 days for each year of the prisoner's sentence imposed by the court,''; and

(ii) by striking ''credit for the last year or portion of a year of the term of imprisonment shall be prorated and credited with in the last six weeks of the sentence'' and inserting ''credit for the last year of a term of imprisonment shall be credited on the first day of the last year of the term of imprisonment[.]''

*Id.* Sec. 102(b)(1)(A). The good-time fix appears independent of the other provisions in Title I.

The First Step Act provides timelines for the implementation of the risk and needs assessment system. Specifically, it gives the Attorney General 210 days after enactment of the law within which to develop and publicly release the risk and needs assessment system. *Id.* Sec. 101 (promulgating 18 U.S.C. § 3632). Within 180 days after that, the Director of the BOP must assess each prisoner and begin to provide appropriate programming. *Id.* (promulgating 18 U.S.C. § 3621(h)). There is a two-year "phase-in" for the BOP to make programming available to all prisoners. *Id.* At the end of Section 102(b), the law provides a delayed effective date for "this subsection" contingent on the release of the risk and needs assessment system:

> (2) EFFECTIVE DATE.—The amendments made by this subsection shall take effect beginning on the date that the Attorney General completes and releases the risk and needs assessment system under subchapter D of chapter 229 of title 18, United States Code, as added by section 101(a) of this Act.

At issue here is whether the delayed effective date in Section 102(b)(2) applies only to the earned time transfer provisions in Section 102(b)(1)(B), or whether it also delays the BOP's implementation of the independent good-time fix in Section 102(b)(1)(A).

**b. The good-time fix is effective immediately because the delayed-effective-date provision is rationally connected only to the new risk and needs assessment system.**

"[A]bsent *a clear direction by Congress to the contrary*, a law takes effect on the date of enactment." *Gozlon-Peretz v. United States*, 498 U.S. 395, 403 (1991) (emphasis added). Here, the only potentially relevant effective date provision in Title I of the First Step Act explicitly links the need for a delay to the risk and needs assessment system. It states: "The amendments made by *this subsection* shall take effect beginning on the date that the Attorney General completes and releases the risk and needs assessment system under subchapter D of chapter 229 of title 18,

5

United States Code, as added by section 101(a) of this Act." *See* First Step Act, Title I, Sec. 102(b)(2). Although that provision considered on its own could be read to encompass the good-time fix, the full statutory context as well as potential constitutional infirmities militate in favor of construing "this subsection" narrowly to mean only the newly promulgated subsection (g) of § 3624, which governs the new earned time credit transfer authority, leaving the good-time fix to be effective immediately in the absence of "clear direction by Congress to the contrary."

### i. The statutory context indicates that the delayed effective date applies only to the earned-time-credits provision.

"[S]tatutory interpretation turns on 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). On its face, the text of the delayed effective date clause provides good reason to construe "this subsection" as referencing solely the new earned time credit transfer provision because of its contingency on the "date that the Attorney General completes and releases the risk and needs assessment system." Only the earned time credit provision has any relation to the risk and needs assessment system. The good-time fix merely adjusts a calculation that the BOP has been making for decades; it requires no new system to implement and, thus, requires no delay. Moreover, the amendments in Section 102(b)(1)(B) repeatedly use the same phrase "this subsection" to mean subsection (g) of section 3624 that will govern earned-time transfer to prerelease custody. That phrase—"this subsection"—does not appear in the Section 102(b)(1)(A) good-time fix. Thus, context favors the narrow reading of delay applying only to subsection (g).

6

Traditional tools of statutory construction also support this interpretation. First and foremost, "'absurd results are to be avoided,' and courts should not construe a statute to 'produce an absurd result that we are confident Congress did not intend.'" *United States v. Fitzgerald*, 906 F.3d 437, 447 (6th Cir. 2018) (quoting *United States v. Turkette*, 452 U.S. 576, 580 (1981), and *United States v. Underhill*, 813 F.2d 105, 112 (6th Cir. 1987)); *see Mellouli v. Lynch*, 135 S. Ct. 1980, 1989 (2015) (rejecting agency construction of statute that "makes scant sense" given the need to avoid "consequences Congress could not have intended") (quoting *Moncrieffe v. Holder*, 569 U.S. 184, 200 (2013)). There is an obvious need to delay implementation of the earned-time-transfer provision. The entirely new risk-and-needs assessment system must be in place before the BOP can begin using time credits earned under that system to determine which prisoners should be transferred to prerelease custody or supervised release.

By contrast, the good-time-credit system is not new, and it operates on a separate plane from the earned time credit transfer and programming provisions of Title I. The BOP has been touting the need for this amendment for many years. The good-time-credit amendment is a simple calculation, subtracting an additional seven days of good-time credit for each year served from compliant prisoners' sentences. The SENTRY computer system of the BOP could implement the adjustment immediately. Unlike larger sentence reductions such as those implemented by retroactive guideline amendments, prisoners impacted by the good-time fix would already be close to release and prepared for reentry. Delaying the good-time fix makes scant sense and undermines rather than furthers coherent implementation of the First Step Act.

Second, courts construe legislation aimed at remedying prior drafting oversights to be immediately effective. In *Gozlon-Peretz v. United States*, the Supreme Court considered the effective date of a statutory amendment to correct an apparent mistake in the Controlled

7

Substances Penalties Amendments Act of 1984, which inexplicably mandated post-confinement supervision for many small-time drug offenders but exempted big-time narcotics offenders. 498 U.S. 404-05. The new Act removed that disparity and mandated post-confinement supervision for all Schedule I and II drug offenders. *Id.* The Supreme Court held, "Given the apparent purpose of the legislation to rectify an earlier mistake, it seems unlikely that Congress intended the effective date to be any time other than the date of enactment." *Id.* at 404-05. Similarly, in this case, the purpose of the good-time fix was to rectify the computation based on actual time served that provided seven days per year fewer than intended. As in *Gozlon-Peretz*, it is unlikely Congress intended the rectification of the good-time-credit calculation to be delayed. Accordingly, the provision should be construed to take effect immediately. *See also ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689 (9th Cir. 2000) ("[C]larifying legislation is not subject to any presumption against retroactivity and is applied to all cases pending as of the date of its enactment.").

In the context of the overall legislation and purpose of the statute, the Court should construe "this subsection" to relate only to § 3624(g) in the effective date section, thereby construing the good-time fix to be retroactive and immediately effective to all current inmates.

        **ii.  Delaying the effective date of the good-time fix would be arbitrary and capricious and violate the Due Process and Equal Protection Clauses of the Constitution.**

Irrational and arbitrary classifications violate the equal protection clause. *Chapman v. United States*, 500 U.S. 453, 465 (1991). The equal protection clause applies to the federal government through the Fifth Amendment's due process clause. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Delaying the effective date of the good-time fix to an uncertain time in the future

would be arbitrary, capricious, and cruel because it would require greater-than-intended incarceration for the class of well-behaved prisoners who, but for the delayed effective date, would be immediately released from incarceration.

Disparate treatment of similarly situated defendants triggers equal protection concerns when there is no rational basis for the distinction. *See Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Here, the disparate treatment of those whose sentences were calculated before versus after the uncertain future effective date "might well trigger equal protection concerns." *Jonah R. v. Carmona*, 446 F.3d 1000, 1008 (9th Cir. 2006) (construing pretrial credit statute to avoid disparate treatment of juveniles and adults); *Myers v. United States*, 446 F.2d 232, 234 (9th Cir. 1971) (holding that the Fifth Amendment requires that all similarly-situated prisoners receive credit under 18 U.S.C. § 3568); *Stapf v. United States*, 367 F.2d 326, 329 (D.C. Cir. 1966) ("Denial of credit . . . where others guilty of crimes of the same or greater magnitude automatically receive credit, would entail an arbitrary discrimination within the power and hence the duty of the court to avoid.").

As in *Jonah R.*, the Court should construe the good-time fix statute to be effective immediately to avoid serious constitutional problems. 446 F.3d at 1008 ("We must interpret statutes to avoid such constitutional difficulties whenever possible."); *see Clark v. Martinez*, 543 U.S. 371 (2005) (describing the principle of constitutional avoidance); *INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (same). Otherwise, the delayed effective date would irrationally and unconstitutionally discriminate against persons who earned the requisite good-time credits sufficient for immediate release. Those prisoners presently close to their release dates who have abided by all institutional rules during their incarceration would be held in custody to await the satisfaction of an unrelated condition precedent—the implementation of the risk and needs

assessment system. Extending an individual's deprivation of liberty with no countervailing purpose would violate the Due Process Clause and its equal protection component in violation of the Fifth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").

Although the amount of additional custody is relatively small, "'To a prisoner,' this prospect of additional 'time behind bars is not some theoretical or mathematical concept.'" *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018) (quoting *Barber v. Thomas*, 560 U.S. 474, 504 (2010)) (Kennedy, J., dissenting). "'[A]ny amount of actual jail time' is significant, and 'ha[s] exceptionally severe consequences for the incarcerated individual [and] for society which bears the direct and indirect costs of incarceration[.]'" *Id.* (quoting *Glover v. United States*, 531 U.S. 198, 203 (2001), and *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017)).

### III. The Court should grant interim release to prevent continuing irreparable harm.

This Court has both constitutional and statutory jurisdiction to review the lawfulness of Mr. Myers's sentence and its execution. *See* 28 U.S.C. §§ 2241 & 2255 (providing statutory habeas corpus jurisdiction to determine the lawfulness of a prisoner's detention); *Boumediene v. Bush*, 553 U.S. 723, 739 (2008) ("The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom."); *see also Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 379-80 (1994) (recognizing ancillary jurisdiction as available to enable the court to manage its proceedings, vindicate its authority, and effectuate its decrees). Concomitant with the Court's

habeas jurisdiction is the power to avoid Mr. Myers's unnecessary incarceration by providing conditional release. *See Hensley v. Municipal Court*, 411 U.S. 345, 352 (1973) (habeas authority includes the power to "order [a] petitioner's release pending consideration of his habeas corpus claim") (citing *In re Shuttlesworth*, 369 U.S. 35 (1962)).

There is no requirement that Mr. Myers exhaust administrative remedies within the BOP before seeking relief from this Court. Under the Supreme Court standard in *Madigan v. McCarthy*, exhaustion is excused where: 1) the prisoner faces irreparable harm from delay incident to pursuing administrative remedies; or 2) the agency has indicated predetermination of the issue, rendering exhaustion futile. 503 U.S. 140, 146-49 (1992). Both of those conditions apply here. Without the Court's intervention, Mr. Myers faces imminent irreparable harm in the form of over-service of his sentence, given that his correct release date under the new law has already passed. As a practical matter, litigation of this question will take more time than is available without causing irreparable harm. Futility is also at issue. The BOP has already notified prisoners that the retroactive amendment to the good-time-credit statute "is not effective immediately." Farah Stockman, *Shutdown Threatens to Delay Criminal Justice Reforms Signed into Law by Trump*, N.Y. Times (Jan. 16, 2019); *see also* Pat Nolan & David Safavian, *When bureaucrats undermine our laws*, The Hill (Jan. 19, 2019) ("rather than put the 54 days into effect immediately despite clear guidance by the First Step Act, the BOP continues to drag its feet."). Accordingly, the Court should not require Mr. Myers to make further efforts to seek an administrative remedy.

Mr. Myers has now served longer than the sentence dictated by the prison term imposed by this Court, and the Court should now act to assure that he does not serve yet another day longer

than the law allows. Upon release, he will begin his supervised-release term, providing appropriate conditions for interim relief while this litigation proceeds. The Court should thus order his immediate release.

**IV. Conclusion**

Because the good-time-credit fix is effective immediately, the Court should grant Mr. Myers's motion under 28 U.S.C. § 2241 and order the BOP to calculate his good-time credits in accordance with the amended statute. While this case is pending, the Court should order Mr. Myers's interim release to avoid continuing irreparable harm.

        Respectfully submitted,

        STEPHEN C. NEWMAN
        Federal Public Defender
        Ohio Bar: 0051928

        */s/ Christian J. Grostic*
        CHRISTIAN J. GROSTIC
        Ohio Bar: 0084734
        JEFFREY B. LAZARUS
        Ohio Bar: 0079525
        1660 W. 2nd Street, Suite 750
        Cleveland, OH 44113
        Telephone:   216.522.4856
        Facsimile:   216.522.4321
        Email:   christian_grostic@fd.org

        *Attorney for John Myers*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on April 24, 2019, a copy of the foregoing Memorandum and Motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

                                      */s/ Christian J. Grostic*
                                      CHRISTIAN J. GROSTIC

                                      *Attorney for John Myers*